[Crim. No. 6494. Fifth Dist. Mar. 15, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMY TOM SPEARS et al., Defendants and Appellants.

**COUNSEL**

Heusdens & Gong, James Heusdens and Daniel A. Bacon for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Eddie T. Keller, and Janice Rogers Brown, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOOLPERT, J.**—In this case we consider the right of two defendants to withdraw guilty pleas taken under conditions suggesting to them probation was "likely." In fact, the nature of the offense was such that probation was a disfavored option (the "unusual case" category), and they were not so advised when their pleas were taken.

On January 19, 1982, an information filed in the Tulare County Superior Court charged defendants with numerous violations of the Penal Code:[1] section 209 (kidnaping); section 459 (burglary); section 211 (armed robbery); section 245 (assault with a deadly weapon); section 182 (conspiracy); and section 136½ (dissuading a witness from attending by bribe). Added were special allegations of section 12022, subdivision (b) (use of a deadly and dangerous weapon), section 12022.5 and section 1203.06, subdivision (a) (1) (personal use of a firearm), and section 12022, subdivision (a) (armed with a firearm). Later, pursuant to section 995 motions, the section 136½ and section 182 counts, along with their special allegation, were dismissed.

On April 5, 1982, the day of trial, there were off-record discussions concerning a plea bargain. When the pleas were taken no one indicated the substance of the earlier conversations.

After the pleas were entered, but prior to the time of sentencing, defendants unsucessfully moved to withdraw their pleas. They have been sentenced to prison. Each appeals after obtaining probable cause certificates.

### THE FACTS

In the early evening of November 10, 1981, Spears and Phillips, accompanied by five others, went to the residence of Sandra and Mark Dalton in Porterville, California. The Daltons lived in a house trailer. One of the five fellow participants was Phillips' son. They entered the residence; each was armed, some with guns and others with baseball bats. Spears allegedly had a .44 caliber pistol, and Phillips a .38 caliber pistol.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

Defendant Spears struck Mark Dalton (hereafter Dalton) on the head with a pistol and accused him of stealing his marijuana crop. Dalton denied the theft, but offered the defendants what marijuana he had, claiming it to be his own which he had grown in the hills. The offer was contingent upon the defendants leaving Dalton and his family alone.

Spears told Dalton that he believed Dalton's brother and another man also participated in the theft. Spears then told Dalton that he had to accompany them in a search for the other thieves. Dalton's wife was threatened that she would not see her husband again if she called for help after they left.

Dalton was placed in Phillips' truck. Spears was also in the truck at this time. Dalton was driven to Phillips' cabinet shop and told to locate the marijuana by telephone or be killed. Dalton made several calls at this time, some to his wife.

Sandra Dalton belatedly called the police; on their arrival they surrounded the cabinet shop. Spears allegedly forced Dalton to sign bills of sale for the property taken from his home, including Dalton's pickup truck which Spears had instructed Phillips' son to burn. Dalton was told to tell the police the whole incident was a bad joke. Spears, Phillips and their friends were arrested and charged with various crimes.

Prior to the preliminary hearing, Phillips allegedly approached Dalton and warned him that he might be killed by other defendants if he did not leave town. Phillips then offered Dalton money to leave the state. Later that same day, Dalton received a telephone call from another participant who arranged to meet with him. At the meeting, Dalton was again offered money to leave town. When he refused, the offer was doubled and apparently paid. Dalton was promised more money would come when he left the state. Additional calls by this person were made to Dalton and he was again warned of danger. Eventually, even more money was paid.

Dalton and his wife left town shortly thereafter. They were arrested for contempt of court in Ceres, California, after they failed to appear as witnesses in the originally scheduled preliminary hearing. Both were kept in custody until they testified.

## THE PLEAS

Prior to sentencing, defendants' motions to withdraw their pleas were denied. On appeal, they claim the court abused its discretion in denying their motions. Two reasons are urged: (1) the apparent belief of all con-

cerned that probation was likely, and (2) their postplea discovery that the prosecutor had not disclosed certain evidence which would have helped them challenge the victim's credibility. We first address the probation issue.

Defendants were willing to plead guilty if several counts were dismissed and others reduced. During the bargaining, mention was made of the possibility that defendants would receive local time and work furlough. The court acknowledged this in its statement of probable cause for Phillips: "During discussions between the counsel and the clients, the counsel and the District Attorney's Office, and all counsel with the Court and Probation Department, a brief summary of the facts of the case was set forth to the Court. It was specifically stated to the Defendant, ROBERT RAY PHILLIPS' counsel that there was a good likelihood that he would receive local incarceration and allowed to participate in the work furlough program. However, at no time were there any specific guarantees of any sentencing or promises made regarding sentencing."

Although off-record plea discussions allegedly included references to doing local time, and purportedly took place while the defendants were together, on this appeal we look to the record for verification of appellants' contention that probation was seriously anticipated.

In Phillips' case, the taking of the plea commenced with his counsel asking for confirmation that his client would be eligible for probation. The court responded: "I don't read it as a mandatory prison, where the Court has no discretion. Do you understand that?" Defense counsel responded that he agreed. The plea was then taken by a careful court which made it clear that no promises had been made, interspersed with references to "if" the defendant should go to prison.

Spears was told no promises were being made. He agreed with the court's denial that neither the judge, defense counsel, nor the district attorney "is promising you, if you plead guilty to these two things we guarantee you wouldn't go to prison, or we guarantee you will get straight probation." Then, in explaining the potential sentence, the court stated: "False Imprisonment as a felony could be state prison. When they say that, they mean it could be 16 months, 2 years, or possibly a maximum of 3 years in prison. . . . I'm not telling you what I am going to sentence you to. I'm telling you what the range could be, and the possible maximum, if worst came, the worst could be 3 years in prison on pleading guilty to that." The court also warned the defendants that if given probation, the terms and conditions of probation must be observed to avoid revocation.

Phillips' plea was to felony false imprisonment (i.e., effected by violence or menace), with admission of an armed with a firearm enhancement. Later he reminded the court that the firearm was not "used," and argued it was only displayed in his belt. ■ ■ ■ ■ However, the evidence was substantial on the menace aspect of this display of a weapon.[2] This was noted by the court during sentencing when it struck the arming enhancement because of its importance on the probation question, saying the arming evidence was "a significant factor in denying probation." No such point of view was expressed earlier when the plea was taken.

Spears entered a plea to assault with a deadly weapon and felony false imprisonment. In the court's words, the plea was to assaulting "Mark Anthony Dalton, with a deadly weapon, and hand gun by force or means of force likely to produce great bodily injury." In addition to pleading to a crime which on its face admits the *use* of a weapon, the evidence against Spears was clear. The court included in its reason for denying probation "the fact that he used this weapon either to bully or intimidate the victim, if not strike him or cause some minor physical injury to him."

Subsequently, and for the first time, while arguing the right to withdraw the pleas, counsel placed in the record an asserted understanding by all concerned that the defendants were local businessmen whose affairs would be jeopardized if they were not given probation and assignment to a work furlough program. The transcripts of the earlier plea taking do not contain any such references; indeed, the court made no on-record promise of that kind. However, a reading of the plea admonishments and outline of the "range" of possible punishment, leads us to the impression that the plea bargain climate was one of real anticipation on the part of the defendants and counsel, if not the court, that probation was likely. At least as to Phillips the court has verified this in terms of a "good likelihood."

### EFFECT OF THE PLEAS ON PROBATION

We now look to the record to see if probation was in fact a viable alternative. As noted above, both defendants entered a plea to violating section 237, felony false imprisonment. Our court has stated that section 237 is not a hybrid crime. ■ "Thus, the decision whether a defendant is sentenced to local time or to prison is not discretionary with the court but depends on

---

[2]Display of a firearm may be considered a "use" under conditions which indicate a purpose to cause fear of harm. (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024]; *People* v. *Caban* (1983) 148 Cal.App.3d 706, 712 [196 Cal.Rptr. 177] (unresolved issue of displaying gun inside waistband); *People* v. *Young* (1951) 105 Cal.App.2d 612, 614 [233 P.2d 155].)

the trier's finding as to whether the crime was 'effected by violence, menace, fraud, or deceit.'" (*People* v. *Manning* (1982) 133 Cal.App.3d 159, 163, fn. 1 [183 Cal.Rptr. 727].) We do not construe that language to mean that probation is prohibited, but rather that once the crime is found to be a felony the court would consider felony probation in the usual manner.

We need not look beyond several trial court benchbooks to find why these facts caused uncertainty about whether probation would be subject to limitation. The *use* of deadly weapons, including firearms, has drawn legislative attention for many years. The use of a gun in felonies has been variously treated as a probation consideration: outright prohibition of probation, disfavored probation status, uncertain status, and in the case of merely being *armed* with a gun, not specifically covered.

Section 1203.06 prohibits probation to defendants who commit certain serious crimes in which firearms are used. (*People* v. *Tanner* (1979) 24 Cal.3d 514, 518-520 [156 Cal.Rptr. 450, 596 P.2d 328].) In the case of other, nondesignated felonies in which there has been the use of a firearm, trial courts retain only "limited discretion" to grant probation. (*Id.,* at p. 519.) Witkin refers to this limited discretion as being one in which "probation is now permitted, but disfavored." (2 Witkin, Cal. Crimes (1983 supp.) Punishment for Crime, § 1056, p. 602.) One court has described the language as expressing a "strong statutory presumption against granting probation . . . ." (*People* v. *Axtell* (1981) 118 Cal.App.3d 246, 256 [173 Cal.Rptr. 360].)

Because the defendants in this case bargained away the felonies which would have *prevented* the court from considering probation (§ 1203.06), the superficial question before the court was whether the pleas left the defendants eligible for probation. Other than the court's stated belief that it would have "discretion," there is nothing in the record suggesting that at the time of taking the pleas the court considered its discretion to be statutorily limited.

If there is an uncertainty when the court is faced with facts of this kind, it may be due to the language of section 1203, subdivisions (e)(1) and (2).[3]

---

[3]The subdivisions have sometimes been numbered (d)(1) and (2). To avoid confusion, all references will be to (e)(1) and (2), as if the subdivisions had been so numbered consistently throughout their history.

Section 1203, subdivisions (e)(1) and (e)(2), provide as follows:

"(e) Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to any of the following persons:

"(1) Unless the person had a lawful right to carry a deadly weapon, other than a firearm, at the time of the perpetration of the crime or his arrest, any person who has been convicted of arson, robbery, burglary, burglary with explosives, rape with force or violence, murder,

Subdivision (e)(1) has undergone little change in its wording. It provides for a disfavored probation status if the defendant was armed with a deadly weapon, "other than a firearm," but only in the case of certain felonies. Under this provision, arming with a metal rod may have consequence, depending upon the crime, but not arming with a revolver. In fact, an arming with a firearm which does not qualify as a "use" appears to fall outside all of these statutory probation restrictions.

■ Subdivision (e)(2) is the *use* provision. It refers to "deadly weapon," but without a firearm exception. The language of an earlier version was the subject of controversy, but the obvious, commonsense conclusion was reached: the unqualified term "deadly weapon" includes firearms. (*People* v. *Alotis* (1964) 60 Cal.2d 698, 706 [36 Cal.Rptr. 443, 388 P.2d 675].)

As time passed and section 1203 was divided into further sections and subsections, the coverage of subdivision (e)(2) was changed. In 1975 the Legislature inserted the "other than a firearm" exception in subdivision (e)(2). For the first time the firearm exception appeared in both subdivisions (e)(1) and (e)(2). (Compare Stats. 1971, ch. 706, p. 1368, with Stats. 1975, ch. 1004, p. 2356.) Probably realizing that it had made probation unrestricted in all use of firearm cases, except for those taking place in one of the greater felonies, the Legislature enacted chapter 581 in 1978 to "prohibit probation except in unusual cases to any person who used a firearm in any crime other than the specified crimes for which probation is prohibited altogether." (Leg. Counsel's Dig. of Sen. Bill No. 1078, 4 Stats. 1978 (Reg. Sess.) Summary Dig., p. 147.) The manner in which this was done was to strike the "other than a firearm" exception from subdivision (e)(2). (Stats. 1978, ch. 1262, p. 4098.)

Unfortunately, in merely dropping the words of the exception, the legislative intent was preserved only in counsel's digest. There was no clear statutory language, such as making the clause read "a deadly weapon[,] [including a firearm,] upon a human being. . . ." However, there is no room for doubt: The section *must* be interpreted as if the above bracketed words and punctuation were included.

## PLEA ADVICE

If these defendants entered pleas to a kidnaping charge and admitted a gun use allegation, probation would have been prohibited. If not so advised,

---

assault with intent to commit murder, attempt to commit murder, trainwrecking, kidnapping, escape from the state prison, or a conspiracy to commit one or more of such crimes and was armed with such weapon at either of such times.

"(2) Any person who used or attempted to use a deadly weapon upon a human being in connection with the perpetration of the crime of which he or she has been convicted."

their pleas would have been defective because of the effect of section 1203.06. (*People* v. *Caban, supra,* 148 Cal.App.3d 706.) ▉ The defendant must be advised of any admission which *prevents* consideration of probation. (*Id.,* at p. 711.) However, in this case the pleas made probation legally possible, but statutorily disfavored and therefore less than probable (unless in the case of Phillips it could be decided that his "arming" did not amount to a "use").

▉ It is not of consequence that the plea bargains included the striking or giving up of certain counts or allegations. Although striking enhancement allegations and dismissing counts may curtail other sentence options, the probation considerations of section 1203, subdivision (e)(2), are unaffected · and may reach *all* of the facts of the crime, including weapons use. (*People* v. *Axtell, supra,* 118 Cal.App.3d 246, 257.)

In this case, defendants were advised of the maximum sentence. However, in giving the "range" of the punishment, references were made to probation without the slightest hint that there were statutory hurdles not faced by the other defendants, or to criminal defendants in general. Thus, because probation was statutorily disfavored, the advice was misleading to the extent that the defendants had been permitted by the court to believe that probation was likely. The questions we must ask are twofold: First, "Had defendants been advised of the statutory presumption against probation, would they have been as willing to plead?" Second, "If the court had thought of the disfavored probation consequence, would it have revised its 'probation likely' comment?" These inquiries are not mere excursions into appellate hindsight; to the contrary, defendants sought to withdraw their pleas prior to sentencing.

We do not decide whether in the absence of any mention of probation as a viable alternative, the court *must* advise a defendant the plea invokes a strong statutory presumption against probation. Instead, we limit ourselves to these facts and the need to advise a defendant that probation is disfavored when the plea and admissions make it so, *and* the defendant, counsel, and the court appear to consider probation "likely." In that situation, to avoid having to grant a subsequent motion to withdraw the plea, the court must disclose the full consequences of such a plea; it shall not consider advice of the maximum punishment permitted by law to be sufficient. (*People* v. *Tabucchi* (1976) 64 Cal.App.3d 133, 142-144 [134 Cal.Rptr. 245].)

▉ It is unnecessary to repeat the policy reasons why, when in doubt, a prejudgment motion to withdraw a guilty plea should be granted. Section 1018 by its own terms requires a liberal approach to the motion. (*Tabucchi,*

*supra,* at p. 144.) ▮ We have no alternative but to hold that the trial court abused its discretion in not allowing defendants to withdraw their pleas of guilty.

We need not address the other issues, including the question of prosecutorial failure to disclose certain payments to the victim-witnesses. However, we note the discovery order was framed in ambiguous language which gave the district attorney inappropriate room to interpret the scope of the order.

The judgments of conviction are reversed. The matter is remanded to the trial court with directions to allow defendants to withdraw their guilty pleas and admissions, and to reinstate the original charges as permitted by law.

Andreen, Acting P. J., and Martin, J., concurred.